UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HEATHER MARIE BRONNSON,

       Plaintiff,

       v.                                  Case No. 10-C-0856

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,

       Defendant.

DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER AND
REMANDING FOR FURTHER PROCEEDINGS

Heather M. Bronnson seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability and disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. § 402(e). Bronnson filed the application on June 20, 2006, stating that she had been unable to work since June 8, 2005, due to her ocular migraines, anxiety, and depression. The Administrative Law Judge ("ALJ") conducted a hearing on May 29, 2009, and determined that Bronnson was not disabled on August 4, 2009. When the Appeals Council denied review on July 28, 2010, the decision of the ALJ became the final decision of the Commissioner.

Bronnson challenges the ALJ's credibility determination, assessment of treating source statements and reliance on state agency opinions, Residual Functional Capacity ("RFC") determination and a finding that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). For the following reasons, the court will reverse and remand this case to the Commissioner for further proceedings.

## STANDARD OF REVIEW

The administrative law judge's opinion on a claimant's disability must be upheld if it is supported by "substantial evidence on the record as a whole." *Walker v. Bowen*, 834 F.2d 635, 639–40 (7th Cir. 1987) (quoting *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984)). "Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir.1995). The court may not reweigh the evidence. *Walker*, 834 F.2d at 640. Further, the ALJ must articulate his assessment of the evidence and the basis for his conclusion to "build an accurate and logical bridge from the evidence to the conclusion." *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). Without such an explanation, the courts cannot undertake meaningful review and should remand the case. *See id.* at 488; *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## FACTS

On March 19, 2002, Bronnson was referred to Dr. Michael Mitchell for a neurological evaluation. (Tr. 254.) At that time, she reported retinal migraines with scotomata and variable visual field deficits in both eyes. The episodes had been occurring monthly and lasting up to 20 minutes. (*Id.*) However, an episode in January involved slurred speech and parestheasias that included the right cheek and perioral region. (*Id.*) Dr. Mitchell concurred with the diagnosis of retinal migraine and opined that the episode in late January could be consistent with acephalgic migraine with complicated features. He prescribed Calan-SR (Tr. 255.)

2

Bronnson returned to Dr. Mitchell on March 5, 2004, with multiple new symptoms, including intermittent clumsiness and falls, frequent muscle cramps in the legs and toes, and intermittent lightheadedness and occasional tunnel vision. (Tr. 252.) Bronnson also reported numbness/tingling of all extremities and the face that would occur several times weekly. Occasionally, she experienced word finding difficulty and retinal migraines. (*Id.*) A brain MRI with contrast was normal. Dr. Mitchell prescribed Quinine for leg cramps, and recommended a retrial of an SSRI to minimize the symptoms triggered by anxiety. (Tr. 253.)

On June 21, 2004, Bronnson had a psychological assessment and began therapy. (Tr. 313-314.) She was tearful, agitated, and anxious. (Tr. 313.) The therapist diagnosed generalized anxiety disorder and developed a treatment plan to reduce anxiety and develop coping skills. (Tr. 314.) On September 23, 2004, Dr. Sadowski-Johnson noted that Bronnson had gone from multiple panic attacks per day to perhaps one per week and suggested increasing the Effexor. (Tr. 292.)

Bronnson returned to Dr. Mitchell on November 30, 2004, with retinal migraines and intermittent symptoms of clumsiness, cramps and parestheasias which all improved since the introduction of Effexor XR. She admitted that her anxiety was better controlled but continued to experience panic attacks. (Tr. 250.) Dr. Mitchell found no evidence of neurological disease and recommended a psychiatric evaluation. (*Id.*)

On February 15, 2005, Dr. Michelle Sadowski-Johnson saw Bronnson, who reported the ocular migraines once per month. (Tr. 290.) The most recent episode had lasted almost one hour. (*Id.*) Dr. Sadowski-Johnson recommended a referral to the neurology clinic at Froedtert for a second opinion but believed that Bronnson had a combination of ocular migraines and anxiety. (Tr. 290.)

3

By May 9, 2005, Bronnson reported that the migraines were occurring almost every other day and were limiting her activity. (Tr. 287.) Along with the migraines, she was experiencing clumsiness, leg cramps, parasthesias, dizziness, urinary urgency, and what she was told was a swollen optic nerve. (*Id.*) Dr. Sadowski-Johnson recommended continued use of Effexor, introduced Inderal LA, and a follow up with neurology. (Tr. 287- 288.)

Bronnson informed her neurologist on May 17, 2005, that her episodes of occular/visual sensations followed by numbness and tingling had increased to the point that they were lasting up to two hours. (Tr. 264.) On June 23, 2005, she had an abnormal awake and drowsy electroencephalogram due to the presence of rare, sharp transients in the left temporal region, which did not appear epileptiform in morphology. (Tr. 259.) The neurologist then prescribed Ativan and Imitrex. (Tr. 261-263.)

On August 1, 2005, Dr. Sadowski-Johnson noted a history of anxiety with continued break through symptoms, ocular migraines, and various neurologic symptoms. (Tr. 285.) She increased the Effexor to 187.50 mg, but Bronnson's anxiety increased and she reported to the emergency room on September 4, 2005, having experienced a "racing heart" for a period of five days. (Tr. 278.) Bronnson appeared anxious. (*Id.*)

On February 1, 2006, Bronnson had a psychological assessment at American Behavioral Clinics with Dr. Michelle Andrade, a psychiatrist. (Tr. 317-320.) During the assessment, Bronnson asked "What good am I?" (Tr. 317.) She reported experiencing panic once a week. (*Id.*) Dr. Andrade noted a GAF of 60-65. (*Id.*) Dr. Goldfarb, a psychotherapist, felt Bronnson's prognosis was "guarded" as of July 26, 2006. On October 11, 2006, Bronnson reported to Dr. Andrade that she had never been "this depressed" and that she was having racing thoughts. (Tr. 383.) In addition, she reported six episodes of

4

seizure-like symptoms. (*Id.*) Dr. Andrade noted that Bronnson spoke with low volume and had a constricted affect. (Tr. 383.)

Bronnson went to Dr. Murano for a consultative examination regarding her mental status on October 17, 2006. (Tr. 331-335.) Bronnson reported having panic attacks three times a week, which lasted from five minutes to one hour. (*Id.*) The symptoms included rapid breathing, a choking sensation, pounding heart, and tremors. (*Id.*) Bronnson stated that she rarely feels better and struggles to get up in the morning, finds it hard to concentrate, and experiences forgetfulness. (Tr. 331.) The report indicates that Bronnson feels like she is dying and complained of numbness and clumsiness. (*Id.*) Bronnson's mother commented that Bronnson used to have an independent personality and living skills but had not presented that way in four or five years. (*Id.*) Bronnson reported taking several medications for psychiatric symptoms, including Lamictal, Effexor, and Lorazepam. (Tr. 332.)

Bronnson reported to Dr. Murano that, in the past, she had a longstanding job with a business firm, but the hours and stress were eventually too much for her. (Tr. 332.) She had "decompensated several times at work, and had to leave work, sometimes being picked up by her husband." (*Id.*) Bronnson added that she felt pressured at work and struggled to maintain even superficial interpersonal contacts. (*Id.*) At the same time, she reported interest in returning to work and referenced part-time employment through her son's school. (*Id.*)

Dr. Murano's mental evaluation noted that Bronnson did not show signs of malingering, was tearful through much of the assessment and stopped several times to compose herself. (Tr. 333.) Her thought content seemed to be reflective of paranoid

5

thoughts, a sense of mistrust of others, and anxiety about her own safety and well-being. (*Id.*) According to Dr. Murano, Bronnson presented as "anxious, hopeless, apprehensive, fragile, and on the verge of deterioration." (Tr. 334.) Dr. Murano felt the following diagnoses appeared appropriate: generalized anxiety disorder, panic attacks with agoraphobia, dysthymia, ocular migraines, and stressors included being in public places. (*Id.*)

On November 7, 2006, Dr. Keith Bauer, a state agency reviewing psychologist, determined from the records that Bronnson was moderately limited in ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them; and ability to respond appropriately to changes in the work setting. (Tr. 336-37.) Bronnson had no significant limitations in other areas, including ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, and carry out detailed instructions. (Tr. 336-37.)

Dr. Bauer analyzed Bronnson's mental condition under Listings 12.04 (affective disorders), 12.06 (anxiety disorders), dsythmia (mild chronic depression), and generalized anxiety disorders with panic attacks. (Tr. 340-48.) He concluded that she had mild restrictions on the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. 350.)

6

When Bronnson saw Dr. Andrade on November 13, 2006, she reported that the Lamictal had stopped the seizures and the Lorazepam helped with the visual disturbance. (Tr. 409.) However, she felt that she may have to stop working at her son's school because she brought all the kid's problems home and felt that her seizures were anxiety induced. (*Id.*)

Her employer wrote a letter on November 15, 2006, describing an incident that occurred during the first quarter of 2005. (Tr. 362.) Bronnson was working at her desk, stopped suddenly, raised her head, and began to stare into space. (*Id.*) She did not respond to her boss or another colleague, but regained her perception minutes later and asked what happened. (Tr. 362.) He did not believe that Bronnson had faked the incident in order to leave early. (*Id.*)

During a psychological assessment on January 27, 2007, Bronnson was sad, cried frequently, presented with low energy, and was irritable. The psychologist noted moderate distress, and assigned a GAF of 58. (Tr. 391-396.)

Bronnson continued to have psychotherapy sessions on January 31, February 20, March 5, March 19, March 28, and April 2, 2007. (Tr. 390, 289, 281, 388, and 387.) Her GAF remained at 58 or 60, and her therapist on April 2, 2007, noted no change in her level of functioning. (Tr. 387.)

On June 8, 2007, Dr. Jacqueline Carter, a neurologist, stated that Bronnson had been in her care since December 6, 2006. She was first seen for facial numbness, visual field obstruction on the right side, peripheral vision loss, and severe headaches. (Tr. 434.) Bronnson indicated that she noticed the symptoms in 1991, but they had worsened to the point she could not function. (Tr. 434.) She continued with the Lamictal 100 mg daily, but

7

a full work up was performed. The EEG and 24 hour Holter EEG did not record any active seizure activity, but they did not exclude seizures as the cause of her episodes. (Tr. 434.) Dr. Carter also noted that on January 12, 2007, Bronnson had been on Lamictal for approximately four months and reported no further episodes of visual disturbance, headaches, or facial numbness. (*Id.*) In addition, Bronnson had been seeing Dr. Andrade, who was managing her bipolar depression and anxiety disorder "which has had a drastic affect on her ability to focus, coordinate, and stay on task." (*Id.*)

In August of 2007, Bronnson indicated that she had been free of the episodes for about six months but they had recurred in April of 2007, and she continued to have two episodes monthly. (Tr. 472.) Dr. Carter wanted to check her level of Lamictal and added a medication. (Tr. 471-72.) When Bronnson returned in November of 2007, she reported no symptoms since August of 2007. (Tr. 471.) However, in October of 2008, she was diagnosed as having pseudoseizures, anxiety, as well as depression, while reporting her condition as unchanged. (Tr. 468.)

Therapy sessions with Dr. Stephen Hart, the treating psychologist, showed ongoing problems with anxiety, panic attacks, and sporadic depression. (Tr. 397-411, 419-433, 451-464.) Dr. Hart completed a Mental Impairment Questionnaire on May 5, 2008. (Tr. 412-418.) He stated that he had treated Bronnson since February 1, 2006, on a weekly to bi-weekly basis. (Tr. 413.) Bronnson had a panic disorder, a generalized anxiety disorder with a Global Assessment of Function score of 55 and the highest score was 55 to 60. (*Id.*) She was treated with psychotherapy and medication management with variable progress. Bronnson also had depression secondary to her anxiety disorder, and an Axis II diagnoses of obsessive-compulsive traits. (*Id.*) She took Effexor, Lamictal, and Lorezapam, which

8

caused fatigue. (*Id.*) Clinical findings included decreased concentration, an anxious affect, depressed mood, and recent and remote memory compromises. (*Id.*)

At that time, Dr. Hart determined that Bronnson's prognosis was "guarded to mildly good" given the chronic condition of her impairments, and opined that her mental condition impaired many of her abilities. (Tr. 415-416.) He found Bronnson was "seriously limited, but not precluded" from remembering work-like procedures; carrying out very short and simple instructions; working in coordination with or proximity to others; making simple work-related decisions; and performing at a consistent pace. (Tr. 415-416.) However, Dr. Hart noted she was between seriously limited, but not precluded and unable to meet competitive standards in describing Bronnson's ability to understand and remember very short and simple instructions and ability to maintain attention for two-hour segments. (Tr. 415-416.) In addition, Dr. Hart observed that Bronnson was unable to meet competitive standards with respect to her ability to respond appropriately to changes in a routine work setting and deal with normal work stress. Moreover, she was between "unable to meet competitive standards" and "no useful ability to function" as to her ability to complete a normal workday or workweek with interruptions from psychologically based symptoms, deal with the stresses of semi-skilled and skilled work, travel in unfamiliar places, and use public transportation. (Tr. 415-416.) Additionally, Dr. Hart indicated that Bronnson had marked limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 417.) Lastly, he noted that she had three or four or more episodes of decompensation within a twelve-month period each of at least a two-week duration. (Tr. 417.)

9

During the hearing before the ALJ, Bronnson testified that she had two unsuccessful attempts to return to work on a part-time basis that were short lived because she got worried and could not handle the stress of the jobs. (Tr. 483-487.) The first was at Crystal Ridge and the other was at the School District of West Allis from September of 2006 to January of 2007. Neither were at Substantial Gainful Activity ("SGA") levels.

Bronnson further testified that she was diagnosed with ocular migraines when she was 16, and began experiencing stroke and seizure-like symptoms in 2001. (Tr. 488.) Her migraines begin with flashes of lights, floating lights, and then she loses her peripheral vision. Bronnson added that she must go to a dark room and lay down for 20 minutes and that even when the lights stop, she may not be able to speak or has slurred speech. She experiences facial numbness and temporary paralysis in her fingers, knees, and toes, and feels "spaced out." Bronnson also testified that she cannot remember talking to people during these periods. (Tr. 490.) Moreover, Bronnson reported that she is clumsy during these episodes, and will fall because she can't feel her feet. (Tr. 491.) In addition, her face slumps, she cannot use her tongue, and she experiences extreme fatigue. (Tr. 491, 493.)

According to Bronnson, she has seizures about every six weeks, and is awake during them but cannot respond. (Tr. 494, 496.) She takes Lamictal, an anti-seizure medication, Effexor, Lorazepam, Ativan, and Nasalcort. (Tr. 494.) In addition to the ocular migraines, Bronnson testified that she experiences anxiety headaches. (Tr. 495.)

Bronnson lives in a house with her husband and children, and tries to cook and clean. (Tr. 496.) She drives rarely, but will shop at the grocery store or convenience store where there are less people. However, Bronnson socializes with family. (*Id.*)

10

Vocational Expert, Stephen Porter, testified at the hearing. (Tr. 497-515.) He stated that Bronnson had past work at the substantial gainful activity level as a claims clerk and office clerk. (Tr. 499-502.) The ALJ posted a hypothetical regarding an individual who could perform work at all exertional levels, was limited to frequent climbing of ramps or stairs, occasional climbing of ladders, rope, or scaffolds, occasional balancing, frequent stooping, crouching, kneeling, or crawling, no more than moderate exposure to unprotected heights, hazards, or moving machinery, and simple, routine repetitive tasks with occasional interaction with the public, co-workers, and supervisors. (Tr. 503.) Porter responded that this person could not perform Bronnson's past relevant work. (Tr. 503-04.) However, she could work as a home health care aide, or evening cashier. (Tr. 504-11.) Porter further testified that employers generally tolerate two or less unexcused or unscheduled absences per month from an employee. (Tr. 512.) Upon further questioning, Porter indicated that his testimony was consistent with the DOT. (Tr. 513.)

The ALJ concluded that Bronnson has the following severe impairments: generalized anxiety disorder with panic attacks and agoraphobia, depression, and ocular migraines (pseudo seizures). (Tr. 11.) However, the mental impairments, singly or in combination did not meet or medically equal the criteria of listings 12.04 and 12.06. Additionally, the ALJ found that Bronnson's impairments did not have at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation." Specifically, in the activities of daily living she has a mild restriction because she can perform all activities unless she has a panic attack or increased anxiety. Moreover, the ALJ concluded that Bronnson has moderate difficulties with regard to social functioning, concentration, persistence, or pace. (Tr. 12.)

11

The ALJ determined that Bronnson has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no more than frequent climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; only occasional balancing; no more than frequent stooping, crouching, kneeling, or crawling, and she must avoid more than moderate exposure to heights, hazards, or use of moving machinery; and be limited to only simple, routine, and repetitive tasks, with only occasional interaction with the public, co-workers, or supervisors. (Tr. 13.)

After discussing the objective medical evidence, the ALJ noted that " the claimant appeared to be experiencing symptoms of anxiety during the latter part of the hearing, and that the evidence supports the contention that her impairments significantly affect her ability to perform work activity. However, the undersigned agrees with the conclusions of the state agency examiners as to the severity of these impairments, as they are well supported by the evidence ...." (Tr. 16.) Although Bronnson could not return to past relevant work, the ALJ concluded that there were jobs available that exist in significant numbers, such as home health care aide, and cashier. (Tr. 17.)

## ANALYSIS

As an initial matter, Bronnson challenges the use of boilerplate language in the credibility assessment. Indeed, the ALJ wrote that "the claimant's medically determinable impairments could reasonably be expected to cause the symptoms of the type alleged; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. 14.) Such language has been deemed "meaningless boilerplate" and criticized for providing no clue as to the weight the ALJ gave a claimant's

12

testimony. *Martinez et al. v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Parker et al. v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The government points out that the ALJ did not simply rely on the boilerplate language, but went on to address the objective medical evidence indicating that Bronnson responded to medication and the frequency of episodes had decreased. Yet the recitation of the medical opinions and noted improvement over time is not inconsistent with statements and testimony regarding the severity of Bronnson's episodes or "bad days." While the government argues that the ALJ "reasonably concluded" that Bronnson's bad days were neither as bad nor as frequent as she claimed, that conclusion appears nowhere in the decision. The recitation of Bronnson's testimony sheds no insight into how it conflicts with the objective medical evidence or the statements the ALJ found not credible. In addition, the ALJ referred to statements of Bronnson's husband selectively and omitted reference to two episodes that Bronnson experienced in the two weeks prior to completing the form. (Tr. 217-220.) Most troubling is the use of the boilerplate assessment in combination with the ALJ's observation regarding Bronnson's apparent anxiety and his finding that "the evidence supports the contention that her impairments significantly affect her ability to perform work activity." (Tr. 16.) Because of these errors, the court cannot ascertain whether the credibility determination was "patently wrong." Thus, remand is proper.

Similarly, a remand is warranted on the ALJ's failure to comply with the requirements of SSR 00-4p. The government acknowledges error when finding "pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" but maintains that it is a harmless technical error because the VE provided "reduced numbers."

13

Social Security Ruling 00–4p requires ALJs to ask whether a VE's testimony conflicts with information provided in the DOT before relying on the VE's testimony. Social Security Ruling 00–4p at 4; *Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008). Ruling 00–4p does not require ALJs to wholly disregard a VE's testimony because part of it disagrees with the DOT, but Ruling 00–4p does require ALJs to resolve discrepancies between the two before relying on the conflicting testimony. *Overman*, 546 F.3d at 464.

Here, Porter, the VE, testified that by limiting the hypothetical person to simple, repetitive routine tasks with only occasional interaction with the public or co-workers, the Specific Vocational Preparation ("SVP") would be 2 or below and "could not be above that." Porter expressed concern that he was using codes that had not been updated since 1992 but indicated that he was relying on "common sense and rationale" to opine that about 20 percent of the total numbers would be available. The disconnect between the testimony and the ALJ's findings arises because the DOT identifies no SVP 1 cashier jobs, and the home health aide occupation is listed as a SVP 4, 6, and 3.

The court disagrees with the government's assessment that the record is unambiguous that the ALJ was not relying on the jobs as defined by the DOT. At page 9 of the decision, the ALJ states that pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the DOT. Moreover, the ALJ began to articulate his own understanding of the DOT before cautioning Porter that he needed to know if Porter was "doing anything beyond the DOT" and Porter responded that he was "trying to stick" with the DOT while admitting that Bronnson wouldn't qualify for the jobs as stated in the DOT in 1992. Minutes later, Porter testified that his testimony was consistent with the DOT. The bottom line is that there was a conflict that was apparent to the ALJ and it is not

14

clear from the decision how the ALJ resolved the conflict between the DOT and Porter's testimony.

Because the court has already determined that it is necessary to remand on these two issues, the court will briefly address Bronnson's remaining arguments. With respect to the argument that the ALJ failed to follow the standards and properly weigh the treating source statements, the ALJ is directed to the opinion of Dr. Carter. A treating source's opinion is entitled to "controlling weight" if it is adequately supported by objective medical evidence and consistent with other substantial evidence in the record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). If the ALJ discounts the opinion of a claimant's treating physician, he must offer "good reasons" for doing so. *Id.*

Here, the ALJ referenced a selective portion of a letter from Dr. Carter, a treating neurologist, but did not appear to consider or weigh Dr. Carter's opinion that the symptoms have "worsened to the point of inability to function" and that Bronnson had been seen by Dr. Andrade who is testing as well as managing her bipolar depression and anxiety disorder which has had a drastic affect on her ability to focus, coordinate, and stay on task." (Tr. 434.) That the government can explain away this omission does not alter the fact that it was not considered or weighed in the ALJ's analysis.

In addition, the ALJ is directed to Bronnson's arguments regarding the failure to properly account for Bronnson's mental limitations in the hypothetical limiting her to simple, routine, and repetitive tasks. The ALJ cited and accepted the conclusions of the psychiatric review of Dr. Keith Bauer, the state agency doctor, finding moderate limitations in numerous categories such as the ability to maintain attention and perform with regular attendance or at a consistent pace, and a marked limitation in the ability to interact appropriately with the

general public. However, restricting the hypothetical to simple, routine tasks and only occasional interaction with the public does not adequately account for the mental impairments discussed by Dr. Bauer, particularly where there is no indication that Porter had reviewed the medical record. *See O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619–20 (7th Cir.2010) (collecting cases)*.* In addition, the program policy statement of SSR 85-15 acknowledges that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." SSR 85–15. As the guidance observes, "[a] claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job." *Id.* For these reasons,

IT IS ORDERED that the decision of the Commissioner is reversed.

IT IS FURTHER ORDERED that this case is remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 24th day of August, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

16